**Jerome LEON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 20055.**

United States District Court
E. D. New York.
March 31, 1961.

Harry D. Breslau, New York City, Francis L. Valente, Jr., New York City, of counsel, for plaintiff.

Cornelius W. Wickersham, Jr., U. S. Atty., for Eastern District of New York, Brooklyn, N. Y., for defendant.

BYERS, District Judge.

This is a federal tort claim action brought by the plaintiff as the result of the rear end striking of his car by a Government truck at about 2:45 p. m. on September 7, 1958 in Clarkstown, Rockland County, New York. The plaintiff's car was at rest on Route 303, a few feet from the place where it merges with Route 9W.

An understanding of the happening will be promoted by observing a sketch which accurately depicts the general locality involved [Plaintiff's Exhibit 1]:

*Civil Action 20055*
*DJ File # 157-52-759.*

9W – 4 lane, 2 way road, goes over Rte 303

N

303 – Here, a 2 lane, one way road, merging with Rte 9W

time: 2:45 PM on 9/7/58
wet road; raining

△ – Merging traffic sign

– Shed (20 paces)

9W

303

It was agreed at the trial that Route 303 is about 16 to 18 feet wide and 9W is about 30 feet wide, and both are cement highways. 9W proceeds in a northerly direction, and the plaintiff intended to enter it passing the point of merger but he had come to a stop as above stated before so doing. It was raining perceptibly at the time and had been for some minutes, and the atmosphere was dark and overcast. There was no stop sign or traffic light at the place where the

roads joined, and it is not disputed that the Government truck struck the plaintiff's car in the rear.

The former vehicle was being driven by the witness, Carl W. Howard, then in the United States Army, and it was a 1957 Chevrolet half-ton pick-up truck.

The plaintiff's car was a 1953 two-door Buick sedan, having a width of about six feet, as was true of defendant's truck.

It is undisputed that the distance from the curve on 303 to the place where the plaintiff's car was, is about 400 feet, and that the defendant's truck was about 112 feet from the plaintiff's car when Howard first observed the latter, which he thought was moving; within a second or so he realized his mistake and he was then about 100 feet from the plaintiff's car when he applied his brakes. On account of the wet surface of the road, the truck somewhat skidded and the rear end collision was the result.

Plaintiff says that his car moved forward from 10 to 15 feet as the result of the impact, while Howard puts it at from 3 to 7 feet. In view of the minor nature of the damage occasioned to the plaintiff's car, the latter dimension, namely seven feet, is accepted as the distance which the plaintiff's car travelled, and it is so found.

■ It is undisputed that the plaintiff was in unfamiliar territory as he was about to enter Route 9W, and in view of the existing weather conditions it was not negligence upon his part to stop his car, preparatory to deciding when it would be safe for him to proceed on Route 9W. He states that in order to stop, he first used his brake.

The testimony is in dispute as to whether the rear red lights on the plaintiff's car were working which would have given notice to the driver of an oncoming vehicle that the plaintiff's car had stopped. The plaintiff says that he had tested his lights that morning before starting on the trip during which the collision occurred, and he is corroborated by his wife. They both said that the lights were in good working order as their inspection showed.

Howard said that he saw no such lights but since, by his own testimony, his truck travelled less than 12 feet before he applied his own brakes, this disputed element of the case seems not to be important, and it is therefore found that the plaintiff is not to be charged with contributory negligence for having brought his car to a stop.

■ It is found that the defendant's truck was travelling at about 25 to 30 miles an hour at the time that Howard applied his brakes, and that cannot be thought to be an excessive rate of speed, although the truck had just rounded about a 45 degree turn, in view of the fact that Howard was transporting a passenger who required hospital treatment, and he would therefore naturally proceed as rapidly as feasible under existing conditions.

It seems to this Court that while the issue of negligence on the part of the Government truck is narrow and perhaps debatable, it should be resolved in favor of the plaintiff for the reason that it would seem a road 16 to 18 feet wide (which was occupied to the width of 6 feet) would afford to a careful following driver an opportunity to avoid such a rear end collision as actually took place. Howard had to decide whether to try to pass on either side of plaintiff's car or to stop his own truck, and while that decision was not easy to make, the fact that the collision took place is some evidence that a passing should have been attempted rather than a braking of the truck.

It is therefore found that the plaintiff has sustained his burden of proof of negligence on the part of the Government truck.

The dispute now turns upon the nature and extent of the plaintiff's damages.

### Property Damage

The evidence shows that the reasonable value of the cost of repairs to the plaintiff's car, caused by this collision, was $218.78 which is the amount hereby found to be due to him, in lieu of the sum of $500 alleged in the second cause set forth in the complaint.

## Plaintiff's Injuries

There is much medical testimony which need not be herein recited because there is general agreement that plaintiff suffered a lower back sacral sprain which has occasioned pain and some temporary disability, and there is no present intention to minimize the physical condition which resulted from this rear end collision. At the same time, it is proper to state that this Court is convinced, and so finds, that the plaintiff did not suffer any disc injury.

The plaintiff's statement that the immediate effect of the impact was to cause him to bounce up and down cannot be rejected out of hand, although the effect of a horizontal striking would not seem to be consistent with such a body movement. He was not conscious of any immediate pain and was not so disabled that he could not drive his car from the place of the happening to his home in Brooklyn; during the evening he began to suffer lower back pain and promptly consulted his physician, Dr. Gerstenblith, who treated him for a few days and since the plaintiff's pain continued, that doctor referred him to Dr. Rabinowitz, an orthopedic surgeon. He first saw the plaintiff on September 13, 1958. His diagnosis was

"Contusion, mid and lower back. Right sacroiliac sprain with right sciatic syndrome."

This doctor's notes include the following entry of November 24, 1958:

"He has shown considerable improvement but still has dull pain in his lower back in the lumbar sacral region which vary in intensity. He has difficulty to stand, walk for any length of time. There is occasional radiation. * * * Examination: is essentially negative including sciatic tension tests. * * * Was advised to continue with support and exercises which were described."

On this doctor's recommendation, he was admitted to the Maimonides Hospital on March 25, 1959, as the result of continued pain in the affected area. As of that date, the doctor's notes read in part:

"* * * The pain is present even when at rest but is worse with activity. He had been wearing a support right along and got some relief from it originally until the present attack. Seen in bed at the hospital he showed some tenderness in the lumbar sacral region, no hamstring spasm. Reflexes were active and symmetrical. * * *"

The plaintiff was discharged on April 3, 1959. Under April 10, 1959, the following is quoted from the doctor's notes:

"Complains of occasional parathesia in his right foot. Low back pain persists with radiation into the buttocks especially on the right side. He is unable to walk any distance. Examination shows stiffness of the back. Neurologic signs are negative. Suggest that he continue with physical therapy. He should be able to do some work wearing the back support."

The note of November 16, 1959 is quoted in part:

"On November 13th after sitting in a chair he developed pain in his lumbo sacral region and right buttock radiating down the right leg and had great difficulty in arising. * * * At his work he is inclined to sit the greater part of the day. He denies any aggravation of pain by coughing, sneezing, bowel or bladder function.

"Examination reveals a tilt of the trunk to the left with some prominence of the right hip. There is tenderness in the lumbosacral region, a mildly positive Lasegue on the right. Reflexes are normal. * * *"

The plaintiff continued under this physician's care and his last note of February 10, 1961 reads in part:

"He was checked and there was demonstrable atrophy of the right thigh, particularly the quadriceps

apparatus. No specific change in treatment was recommended."

This doctor expressed the opinion that the injuries so sustained, and the pain, are permanent.

It should be said in connection with this witness' testimony that part of his notes of November 24, 1958 and March 25, 1959 were brought to light as the result of a careful, searching cross-examination. In the course of the latter he stated that in giving his opinion as to the permanency of disability, he had not taken into consideration that the plaintiff plays golf.

The general impression made by this witness' testimony is that his professional judgment as stated on the witness stand, was intended to present the plaintiff's actual condition in the light most favorable to him for the purpose of this litigation.

The defendant called Dr. Sigmund Foster, whose qualifications in connection with physical rehabilitation were well established. He examined the plaintiff on February 23, 1960 and found that the spine was in normal sacral alignment and that there was no injury to the bony structure. He observed no evidence of a tilt to the spine, and that the plaintiff's gait was normal with a slight limp after the removal of the back support; he observed no muscular atrophy nor indication of root involvement. This examination was held after the witness had read the report submitted by Dr. Rabinowitz to the plaintiff's attorneys, which was based upon his notes heretofore, referred to.

Dr. Foster caused the plaintiff to submit to the straight leg raise [Lasegue test] which was accomplished in the normal way. Measurement of the muscles showed a little lower figure on the right than the left. The tendon reflexes were normal, as were the results of the sensitivity test.

His diagnosis was that there was no neuromuscular or orthopedic disability but that the plaintiff had sustained a low back sprain, and he was clearly of the opinion that there was no disc involvement.

This witness did not venture a precise diagnosis but said that the plaintiff's future history would somewhat depend upon his own mental attitude, and the termination of the pending litigation.

The testimony as a whole yields this finding: The plaintiff did suffer a low back sprain, as the result of this rear end collision. He has worn a support as the result of the happening and, as he said, he wears it 90% of the time, which is consistent with the above finding.

The result of the sprain is to cause periods of pain which are intermittent and do not affect his sedentary occupation. This means that the injury is not as disabling as it would have been in the case of such a manual worker as a longshoreman; the fact that it is not so serious but that he can play golf, supports the theory that the periods of pain and disability are recurrent but not constant. This means that a finding of permanent partial disability would not be justified by the evidence.

The Government urges that attention be given to the plaintiff's prior medical history for the purpose of convincing this Court that he is the kind of a person who exaggerates his own ills. If that be granted for the sake of argument, little or no light is thrown upon the nature and extent of the present injury. A lower back pain is a very definite and occasionally disabling thing and must be dealt with as such.

### Damages
Pain and suffering ........ $4,500.00.

### Special Damages
*Loss of Earnings*

There was filed on December 9, 1960 in connection with the pre-trial a statement of facts which lists the items claimed under this head, and the last item reads:

"Loss of earnings None."
The reason for that statement appears in the testimony, namely that the plaintiff was paid his full wages by his employer

during the times that he was unable to work by reason of this injury.

Testimony indicated that the plaintiff claims in this connection, the sum of $1,639 for a total period of 60 days. It is argued that this sum should be awarded in spite of the decision in the case of Drinkwater v. Dinsmore, 80 N.Y. 390, 395, and a quotation from that opinion is permissible:

"Before the plaintiff could recover for the loss of wages, he was bound to show that he lost the wages in consequence of the injuries, and how much they were. The defendant had the right to show that he lost no wages, or that they were not as much as claimed."

It is difficult to see why the foregoing does not correctly state the rule of law that should govern such a situation. The plaintiff assumes the burden of proving that he is entitled to be compensated for a loss that he has sustained, which means that unless there is such a loss he is not entitled to a recovery under this head.

■ That rule was followed in a memorandum decision of Judge Bruchhausen dated January 9, 1961, in the case of DePaulis v. United States of America, D.C., 193 F.Supp. 7, and until the Court of Appeals of New York overrules the Drinkwater case, it should be followed as the law which governs the plaintiff's cause of action. Therefore this element of alleged damage is disallowed.

*Hospital Bills*

The amount is $550, of which $533 is to be paid by the Blue Cross. This Court is constrained to allow this item within the decision of the Drinkwater case and also Landon v. United States, 2 Cir., 197 F.2d 128, even though it would seem that the actual loss sustained by the plaintiff is the difference between the two sums last referred to, plus whatever the Blue Cross premium would be that he paid; this, on the theory that the plaintiff has undertaken to show that he has sustained damages in the amount asserted and has actually failed to establish the fact of loss.

■ However, the law seems to recognize that under these circumstances the amount claimed must be allowed as the fair and reasonable value of the hospital services.

Doctors' Bills

| | | |
|---|---|---|
| Dr. Gerstenblith | $ 44.00 | Allowed. |
| Dr. Rabinowitz | $185.00 | Allowed. |
| Dr. Paley—the necessity for this consultation was not demonstrated, and the same is | | Disallowed. |
| Dr. Sherman—this service had to do with dietary advice for loss of weight which is not shown to have been connected with the accident. | | |
| Rose Eckelson, Physio-Therapist, for diathermy, massage, etc. | | Disallowed. |
| | $ 25.00 | Allowed. |
| Back Support | $ 24.00 | Allowed. |
| Taxi Fares for trips to doctor's office, etc. | $ 25.00 | Allowed. |
| Medicines | $ 22.00 | Allowed. |
| | $325.00. | |

The foregoing state the findings in respect of special damages.

Judgment is therefore awarded to the plaintiff in the sum of $5,593.78, with costs.

If additional findings are desired, they may be settled on five days' notice.